MARION S. BOULANGER ET AL. *vs.* FIRST NATIONAL
STORES, INCORPORATED, ET AL.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued October 6th—decided December 13th, 1932.

*Arthur B. O'Keefe,* with whom was *James M. Kelly,* and, on the brief, *Harry M. French,* for the appellants (defendants).

*S. Polk Waskowitz* and *Edward S. Pomeranz,* with whom, on the brief, was *George Miske,* for the appellees (plaintiffs).

HINMAN, J. The plaintiff is the dependent widow of Joseph J. Boulanger and was awarded compensation in consequence of a determination by the compensation commissioner, affirmed by the Superior Court on appeal, that his death arose out of and in the course of his employment. The validity of this conclusion is the ultimate question presented by the appeal to this court. The detailed facts found as to the circumstances leading up to and attending the tragedy include the following: On July 11th, 1931, Boulanger was the grocery department manager of a combination meat and grocery chain store operated by the defendant in the town of Windsor. There was also a manager of the meat department, and on the door of the store there was a combination lock which required

the presence of both managers with their keys when the store was opened in the morning and closed at night. The store is located on Broad Street, the main highway through Windsor, and the deceased's residence was located about five hundred feet south of the store on the same street. Windsor has no organized police force. Prior to becoming manager in the Windsor store, the decedent had worked for the defendant in a store at Poquonock. The rules of the employer require that the receipts of all stores be deposited each day in the bank, and there being no bank in Poquonock the decedent had purchased out of his own funds a leather brief case which he used to transport the moneys from the store in Poquonock to a bank in Windsor. When he was transferred to Windsor he retained this brief case and used it, with the defendant's knowledge, to transport various papers in connection with the business to his home, where he worked on them.

In a remote part of Windsor lived Tony Klim and Vito Petraitis. A week or two prior to July 11th Klim had observed the decedent counting money in the store on Saturday night prior to closing, knew his habits from observation, and believed that the brief case which he carried from the store to his home each Saturday night contained the money taken in by the decedent in the store. On Saturday, July 11th, Klim met Petraitis and told him that he knew where they could get some easy money, that Boulanger carried the employer's money in a brief case to his home Saturday night and that it would be an easy matter to "stick him up" and get the brief case and the money. It was arranged by the pair that they would meet in Windsor near the store that night, hold Boulanger up and obtain the money. They met accordingly, walked past the store several times, observed Boulanger en-

gaged in his usual activities, and waited for him to close the store. The grocery manager of such a store has much paper work to do, considerably more than the meat manager, and at eleven-forty-five p.m. the meat manager, having finished all of his clerical work, was anxious to go home and not be delayed by Boulanger, who was still working on his records. For the accommodation of the meat man, Boulanger, as he had often done in the past, closed up the store with the meat man. He had finished a report of the cash receipts, which was due on Monday morning at the company's office in East Hartford, but there remained the further duty of mailing it, and there was also other paper work which he had not finished and this he put in the brief case to take home and finish over Sunday. The defendant's superintendent knew it was the decedent's habit and custom to mail his daily reports at the close of the night's store work and to take clerical work home.

After the store was locked Boulanger went to a drug store and purchased postage stamps which he affixed to envelopes addressed to the company and containing the report, and mailed them at a letter box on a corner situated between the store and his home. He had just deposited them in the box and turned away to resume his journey home, when he was set upon by Klim and Petraitis and shot and killed. They had been trailing him, and advancing, bent upon robbery, while he was in the act of mailing his report, but the actual attack was not culminated until he had just turned away from the mail box. They wrested from him the brief case which he was carrying and which they presumed contained the store money and ran into the woods with it, where, upon rifling it, they discovered that it contained a number of papers but no money. When the safe in the store was opened the

next day it was found to contain intact the entire cash receipts of the store for Saturday. Boulanger's assailants had no personal animosity toward him and their sole purpose in attacking him was to get from him the money from the Saturday receipts which they presumed he had in his possession.

In the foregoing statement we have given effect to such corrections of the finding pursued on the appeal as we deem to be warranted, but none of them are of vital or material effect upon the conclusions to be drawn from the facts as a whole. The facts regarding the acquisition and use of the brief case by the decedent while employed at the Poquonock store, which were sought to be stricken out, are material only to the extent that they explain the possession thereof by the decedent, since it does not appear that his assailants knew that while at Poquonock he used it to carry his employer's money from store to bank.

The first major inquiry is whether, upon the facts disclosed by the finding, the decedent's fatal injury may be held to have arisen in the course of his employment by reason of having occurred within the period of his employment, at a place where he might reasonably be, and while he was reasonably fulfilling the duties of his employment, or engaged in doing something incidental to it. *Larke* v. *Hancock Mutual Life Ins. Co.*, 90 Conn. 303, 308, 97 Atl. 320. While the course of employment does not, as a general rule, embrace the use of highways while going to or returning from the place of employment, the recognized exceptions include situations where the employee is using the highway in doing something incidental to his employment, with the knowledge and approval of the employer. *Whitney* v. *Hazard Lead Works*, 105 Conn. 512, 518, 136 Atl. 105. The scope and limitations of this exception have been illustrated in numerous cases, including

that just cited. *DeRosa* v. *Levering & Garrigues Co.*,
111 Conn. 655, 151 Atl. 246; *Ohmen* v. *Adams
Brothers,* 109 Conn. 378, 146 Atl. 825; *Flanagan* v.
*Webster & Webster,* 107 Conn. 502, 142 Atl. 201; *Corvi*
v. *Stiles & Reynolds Brick Co.,* 103 Conn. 449, 130
Atl. 674; *Mason* v. *Alexandre,* 96 Conn. 343, 113 Atl.
925. See also *Kyle* v. *Greene High School,* 208 Iowa,
1037, 1040, 226 N. W. 71, and cases cited.

It is clear that, in his conduct with reference to the
mailing of the report and in depositing it in the mail
box, the decedent, although on his way home, was
within the exception as doing something incidental to
his employment and therefore to be regarded as in the
course of it. Our interpretation of the finding is that
the only movement of decedent which intervened be-
tween his dropping the report in the mail box and the
fatal shot was his turning away from the box with the
apparent purpose of thereupon proceeding homeward.
The facts do not require, nor do the spirit and purpose
of the Compensation Act warrant, the turning of so
short a corner as to hold that the mere act of turning
away from the box, obviously as appropriate and
necessary to a return to the store had such course been
intended, must be regarded as such a departure from
the course of employment and definite entry upon the
journey home as to terminate liability for an award
which, so far as concerns this element of the case,
clearly would have attached had the shot been fired
while the decedent was in the act of depositing the
report in the mail box. The finding also discloses that
Klim and Petraitis had been trailing Boulanger on his
way to the box and advancing to the attack when he
reached it and that it was only the culmination of the
assault—the shot and the seizing of the brief case—
which occurred after the mailing of the report. Upon
these facts the ruling that the injury was sustained in

the course of employment is justified, without resort to a consideration of the further question whether the effect of the doing of clerical work by the decedent at his home was to so extend the scope of the course of his employment as to render compensable the injury occurring while he was traveling home from his place of employment. *Whitney* v. *Hazard Lead Works, supra; Porter* v. *Stoll Oil Refining Co.,* 242 Ky. 392, 395, 396, 46 S. W. (2d) 1090.

The remaining question is whether the facts sustain the commissioner and the Superior Court in holding that the decedent's injury was "the result of a risk involved in the employment or incident to it, or to the conditions under which it is required to be performed" and therefore arose out of the employment. *Marchiatello* v. *Lynch Realty Co.,* 94 Conn. 260, 263, 108 Atl. 799; *Madore* v. *New Departure Mfg. Co.,* 104. Conn. 709, 712, 134 Atl. 259; *Stakonis* v. *United Advertising Corporation,* 110 Conn. 384, 148 Atl. 334; *Lovallo* v. *American Brass Co.,* 112 Conn. 635, 640, 153 Atl. 783. The main contentions of the appellant are that the injury does not fall within these specifications because Boulanger was not required or permitted to carry the store receipts home, and was not so carrying the money but was only erroneously supposed by his assailants to be doing so. The limitations of causal connection of injury with employment, while appropriately restricted, are not so narrow as to render these considerations controlling. While an injury to an employee resulting from a risk to which everyone is exposed and to which he is not by his employment abnormally subjected does not arise out of that employment, if, by reason of the nature or duties of his employment, the risk and hazards are greater than is common to ordinary persons, the injury may be held to arise out of the employment because the abnormal

risk was necessarily incident thereto. *McCulloch* v. *Pittsburgh Plate Glass Co.*, 107 Conn. 164, 168, 140 Atl. 114 and cases cited; *Lawrence* v. *George Mathews, Ltd.*, 21 B. W. C. C. 345, 362.

Here, the managerial nature of Boulanger's employment involved, as one of the assassins knew from previous observation, the handling and custody of the store money; he was under necessity of carrying home work to be done there and for convenience in doing this appropriately used the brief case which, it appears, his assailants inferred contained, instead, the money; and the duties of his employment required him on the night in question to traverse unpoliced streets alone at a late hour to mail his report, as well as to reach his home. For these reasons the commissioner was warranted in finding that the hazard of being held up and killed by bandits on the public highway was annexed to his employment in a greater degree than to that of the ordinary worker in the ordinary occupation, and this added peril was a risk incident thereto. Therefore the conclusion that the injuries which caused Boulanger's death arose out of, as well as in the course of, his employment was adequately supported.

There is no error.

In this opinion the other judges concurred.